[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-12170

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUG 26, 2011
JOHN LEY
CLERK

D. C. Docket No. 1:08-cv-02095-CAM

VERONZA L. BOWERS, JR.,

Petitioner-Appellant,

versus

JEFFREY KELLER, Warden,
UNITED STATES PAROLE COMMISSION,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Northern  District of Georgia

_____

(August 26, 2011)

Before HULL and BLACK, Circuit Judges, and HUCK,[*] District Judge .

PER CURIAM:

_____

[*] Honorable Paul C. Huck, United States District Judge for the Southern District of Florida, sitting by designation.

Veronza L. Bowers appeals the district court's denial of his petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2241. Bowers is subject to the 1976 Parole Commission and Reorganization Act because he is incarcerated for an offense he committed prior to the effective date of the Federal Sentencing Guidelines—specifically, Bowers is serving a life sentence for the 1976 murder of a U.S. Park Ranger. The primary issue before us is whether the United States Parole Commission engaged in "unauthorized action" during Bowers' mandatory parole proceedings. *Glumb v. Honsted*, 891 F.2d 872, 873 (11th Cir. 1990). We conclude that a United States Parole Commissioner engaged in such unlawful action, which impermissibly tainted the Parole Commission's June 14, 2005, decision reopening Bowers' mandatory parole proceedings.

## I. STATUTORY BACKGROUND

As this case centers around the actions of the United States Parole Commission (Parole Commission), an initial understanding of the governing statutes and regulations is necessary to provide the proper context to Bowers' parole proceedings.

A.   *The Parole Act*

In 1976, Congress passed the Parole Commission and Reorganization Act (Parole Act). Pub. L. No. 94-233, § 2, 90 Stat. 219 (1976) (formerly codified as

2

18 U.S.C. §§ 4201–4218) (repealed 1984; *see* 18 U.S.C. §§ 4201–4218 note

concerning effective date of repeal).[1]  The purpose of the Parole Act was neither to

"encourage or discourage the parole of any prisoner;" rather, the purpose was to

"assure the public and imprisoned inmates that parole decisions are openly

reached by a fair and reasonable process after due consideration has been given

the salient information."  S. Rep. No. 94-648, at 20 (1976) (Conf. Rep.).  To

achieve this purpose, the Parole Act made the Parole Commission "independent of

the Department of Justice for decision-making purposes."  *Id.*; *see also* 18 U.S.C.

§ 4202 (establishing the Parole Commission "as an independent agency in the

Department of Justice").  The Parole Act also established "clear standards as to the

process and the safeguards incorporated into it to insure fair consideration of all

relevant material, including that offered by the prisoner."  S. Rep. No. 94-648, at

21.

Under the Parole Act, an inmate serving a life sentence, like Bowers, is

eligible for release on discretionary parole after serving ten years.  *See* 18 U.S.C.

§ 4205(a).  If parole is not granted at this 10-year mark, the inmate is provided

---

[1]  Unless otherwise indicated, all citations of 18 U.S.C. §§ 4201–4218 refer to the last amended version of the 1976 Act, which was applicable in 2005 and is printed at 18 U.S.C. §§ 4201–4218 note.

subsequent parole proceedings (Statutory Interim Hearings) every 24 months. *See* 18 U.S.C. § 4208(h)(2); 28 C.F.R. § 2.14 (2005).[2]

B.    *The presumption of mandatory parole*

If, after serving 30 years of a life sentence, the inmate has still not been released on parole, the Parole Act entitles an inmate to "mandatory parole"[3] unless the Parole Commission makes specific findings to overcome the statutory presumption of release. 18 U.S.C. § 4206(d). The "mandatory parole" provision "provides more liberal criteria for release on parole for prisoners with long sentences after they have completed two-thirds of any sentence or thirty years, whichever occurs first." S. Rep. No. 94-648, at 27. Specifically, the Parole Act provides:

> Any prisoner . . . who is not earlier released . . . shall be released on parole after having served two-thirds of each consecutive term or terms, or after having served thirty years of each consecutive term or terms of more than forty-five years including any life term, whichever is earlier: *Provided, however,* That the Commission shall not release such prisoner if it determines that he has seriously or frequently violated institution rules and regulations or that there is a reasonable probability that he will commit any Federal, State, or local crime.

---

[2]  Unless otherwise indicated, all citations to the Parole Commission's regulations refer to those in effect through July 1, 2005.

[3]  We use the term "mandatory parole" in accordance with the Parole Commission's regulations. *See* 28 C.F.R. § 2.53.

4

18 U.S.C. § 4206(d). Bowers' petition is based primarily on the Parole Commission's actions surrounding his mandatory parole proceedings.

The Parole Act grants the Parole Commission the power, "pursuant to the procedures set out in this chapter," to "grant or deny an application or recommendation to parole any eligible prisoner." 18 U.S.C. § 4203(b)(1). The Parole Commissioners do not conduct the initial parole hearings, including the initial mandatory parole hearing. Rather, the Parole Commissioners delegated this function to Hearing Examiners or a panel of Hearing Examiners pursuant to § 4203(c) of the Parole Act. 28 C.F.R. § 2.23(a). Typically, a single Hearing Examiner conducts the hearing and makes a recommendation, which is then reviewed by a second examiner, and a third, if necessary. *See* 28 C.F.R. §§ 2.13, 2.23. The concurrence of two Hearing Examiners is required to obtain a panel recommendation. 28 C.F.R. § 2.23. After the concurrence of two examiners, the Hearing Panel's recommendation goes to a single Regional Commissioner for review. *See* 28 C.F.R. §§ 2.23, 2.24.

When presented with the recommendation of the Hearing Panel, the Regional Commissioner has three options. Under the first option, which is utilized in most cases, the Regional Commissioner concurs with the Hearing Panel, and the recommendation then becomes an effective Parole Commission

decision. *See* 28 C.F.R. §§ 2.23(d), 2.24(a). The prisoner or Attorney General may, within 30 days, appeal this "decision of a [R]egional [C]ommissioner" to the Parole Commission's appellate body, the National Appeals Board. *See* 18 U.S.C. § 4215; 28 C.F.R. §§ 2.26(a), (f).[4] A second option permits the Regional Commissioner to "[r]emand the case for a rehearing, with the notice of action specifying the purpose of the rehearing." 28 C.F.R. § 2.24(b)(2). In Bowers' case, the third option was implemented, which allows the Regional Commissioner to designate certain cases for the original jurisdiction of the Parole Commission. 28 C.F.R. § 2.24(b)(1).

C.    *The original jurisdiction of the Parole Commission*

The Parole Commission has denominated several categories of cases as appropriate for original jurisdiction, including "prisoners serving life sentences," like Bowers. *See* 28 C.F.R. § 2.17.[5] In this option, the Regional Commissioner sets the case for original jurisdiction pursuant to § 2.17, votes on the case, and refers the case to another Parole Commissioner for further review. *See* 28 C.F.R. §§ 2.24(b)(1), 2.17(a). The Parole Commission's original jurisdiction decision

---

[4] The regulations set out seven permissible grounds for appeal. *See* 28 C.F.R. § 2.26(e).

[5] The Parole Commission revised this regulation in 2010, adding a category for prisoners, like Bowers, "whose offense behavior caused the death of a law enforcement officer while the officer was in the line of duty." 28 C.F.R. § 2.17(b)(4) (2011).

"shall be made on the basis of a majority vote of Commissioners holding office at the time of the decision." 28 C.F.R. § 2.17(a). A prisoner may appeal the original jurisdiction decision, but it "shall be submitted as a petition for reconsideration under § 2.27." 28 C.F.R. § 2.26(a)(1). "The previous decision made under § 2.17 may be modified or reversed only by a majority vote of the Commissioners holding office at the time of the review of the petition." 28 C.F.R. § 2.27(a).

During Bowers' parole proceedings, the Parole Commission also utilized a regulation permitting the reopening of a case. Section 2.28 sets forth six situations in which the Parole Commission can reopen a case; only the sixth situation, the "receipt of new and significant adverse information," is relevant here. 28 C.F.R. § 2.28. Upon the "receipt of new and significant adverse information," § 2.28(f) permits a Parole Commissioner to "refer the case to the National Commissioners with his recommendation and vote to schedule the case for a special reconsideration hearing." 28 C.F.R. § 2.28(f). This referral "automatically retard[s] the prisoner's scheduled release date," and the special reconsideration hearing may be scheduled upon the concurrence of two Parole Commissioners. *Id*.

D.    *The Parole Commissioners*

7

An understanding of the Parole Commission itself, and how it has evolved, is also helpful to understanding Bowers' parole proceedings. The Parole Act originally provided for a nine-member Parole Commission: a Chairman, three National Commissioners to serve on the National Appeals Board, and five Regional Commissioners to make first-level parole decisions. *See* 18 U.S.C. §§ 4202, 4204(a)(5). Following passage of the Sentencing Reform Act of 1984, Pub. L. No. 98-473, ch.2, 98 Stat. 1987 (1984) (codified as amended at 18 U.S.C. §§ 3551 *et seq*., 28 U.S.C. §§ 991 *et seq*),[6] the Parole Commission began a phase-out process and was set for abolishment in 1992. The life of the Parole Commission has been extended multiple times, in 1990, 1996, 2002, 2005, and 2008.[7]

---

[6] The Sentencing Reform Act "replace[d] a system of indeterminate sentences and the possibility of parole with determinate sentencing and no parole." *Walden v. United States Parole Comm'n*, 114 F.3d 1136, 1138 (11th Cir. 1997). Although the Sentencing Reform Act "abolishe[d] the Parole Commission, and repeal[ed] most of the pre-existing statutory framework governing parole of federal prisoners," § 235 saved "the Parole Commission and the federal parole statues for a period of time during which the transition to the new system will occur." *Id.*

[7] *See* Judicial Improvements Act of 1990, Pub. L. No. 101-650, § 316, 104 Stat. 5089, 5115 (1990) (extension from 1992 to 1997); Parole Commission Phaseout Act of 1996, Pub. L. No. 104-232, § 2(a), 110 Stat. 3055 (1996) (extension from 1997 to 2002); 21st Century Department of Justice Appropriations Authorization Act, Pub. L. No. 107-273, § 11017(a), 116 Stat. 1758, 1824 (2002) (extension from 2002 to 2005); United States Parole Commission Extension and Sentencing Commission Authority Act of 2005, Pub. L. No. 109-76, § 2, 119 Stat. 2035 (2005) (extension from 2005 to 2008); United States Parole Commission Extension Act of 2008, Pub. L. No.110-312 § 2, 122 Stat. 3013 (2008) (extension from 2008 to 2011).

Beginning in 1998, the Attorney General reported to Congress annually whether "the continuation of the Commission is the most effective and cost-efficient manner for carrying out the Commission's functions." Pub. L. No. 104-232, § 3, 110 Stat. 3055, 3056 (1996). The Attorney General has reported each year that "it is more cost effective for the Parole Commission to continue as a separate agency." *See* History of the Federal Parole System, p. 2, found at www.usdoj.gov/uspc/history.htm (last visited Aug. 1, 2011). Most recently, the life of the Parole Commission was extended from November 1, 2008, to November 1, 2011. Pub. L. 110-312, § 2, 122 Stat. 3013 (2008).

Although the number of Parole Commissioners has declined following the passage of the Sentencing Reform Act, the terms "Regional Commissioner" and "National Appeals Board" are still applicable. *See* 28 C.F.R. § 2.1(c),(e). Instead of having separate Regional Commissioners, one of the Parole Commissioners is now assigned "to make initial decisions" as a Regional Commissioner. 28 C.F.R. § 2.1(e). Likewise, instead of having three Parole Commissioners designated as National Appeals Board members only, the Parole Commission sits "as a body to decide appeals taken from decisions of a Regional Commissioner, who participates as a member of the National Appeals Board." 28 C.F.R. §§ 2.1(c); 2.26(b)(2). These same Parole Commissioners also review "original jurisdiction"

9

cases pursuant to 28 C.F.R. § 2.17.  Essentially, each Parole Commissioner may wear different "hats" under the Parole Act and the Parole Commission's regulations—whether sitting as a single Regional Commissioner, a member of an appellate body, or sitting "en banc" in an original jurisdiction proceeding.

At the time of Bowers' parole proceedings in 2005, the Parole Commission consisted of five members: Chairman Edward F. Reilly, Jr., Commissioner Cranston J. Mitchell, Commissioner Patricia K. Cushwa, Commissioner Isaac Fulwood, Jr., and Commissioner Deborah A. Spagnoli.  Today, the Parole Commission consists of four members: Chairman Fulwood, Commissioner Mitchell, Commissioner Cushwa, and Commissioner J. Patricia Wilson Smoot, who was appointed in 2010.  *See* USDOJ: USPC: The Chairman and Commissioners, http://www.justice.gov/uspc/executive.htm (last visited Aug. 1, 2011).  Our concerns with Bowers' mandatory parole proceedings center only around the actions of Commissioner Spagnoli in 2005.  Commissioner Spagnoli has since resigned.

## II.  FACTUAL BACKGROUND

With the background of the Parole Act and the Parole Commission's regulations in mind, we now describe Bowers' proceedings before the Parole Commission.  The facts are lengthy, but undisputed.  The record is composed

primarily of documents obtained by Bowers from the Parole Commission under the Freedom of Information and Privacy Acts; many of these same documents were also submitted by the Parole Commission.

For the purposes of our analysis in Part V, we focus primarily on the Parole Commission's reopening of Bowers' case on both February 17, 2005, and June 14, 2005. We ultimately conclude the February 17, 2005, reopening was lawful under § 2.28(f), but the June 14, 2005, reopening was tainted by the "flagrant, unwarranted, or unauthorized" actions of Commissioner Spagnoli. *Glumb*, 891 F.2d at 873. Although our analysis centers on the events surrounding these two reopenings, we present the full history of Bowers' parole proceedings to date.

A.    *Bowers' underlying 1974 conviction*

Bowers, a former Black Panther, was convicted for the 1973 murder of U.S. Park Ranger Kenneth C. Patrick in Point Reyes National Seashore. On April 26, 1974, the United States District Court for the Northern District of California sentenced Bowers to life in prison. The Ninth Circuit Court of Appeals affirmed his conviction on appeal. *United States v. Bowers*, 534 F.2d 186, 187 (9th Cir. 1976).

The Ninth Circuit stated that Bowers and two other men "had been stopped by [Ranger Patrick] while on an expedition to poach deer, and appellant Bowers

11

had shot [Ranger Patrick]." *Bowers*, 534 F.2d at 188. According to the Parole Commission, Bowers shot Ranger Patrick in the chest after Ranger Patrick stopped their car to investigate. Bowers jumped out of the car and shot Ranger Patrick a second time, hitting him in the left wrist. Ranger Patrick then staggered down the road and fell into the bushes. The driver brought the car alongside the dying ranger; Bowers attempted to shoot him a third time, in the chest, but his gun misfired. Bowers then attempted a fourth shot but missed. As the car left the scene of the shooting, Bowers asked one of the other men if he had seen the ranger twitch when Bowers shot him as he was lying on the ground. Several days later, Bowers told another friend who suspected him of the killing that "Yes, I had to get me one" and that the ranger had "kicked like a chicken when [Bowers] shot him."

Despite his conviction for murder, Bowers has always maintained his innocence and contends he was targeted for prosecution based on his Black Panther membership. In this context, Bowers sometimes refers to himself as a "political prisoner." Although there is no support for Bowers' claim that he is a "political prisoner," the validity of his 1974 murder conviction is not before us. We are concerned only with the actions of the Parole Commission 30 years later during Bowers' mandatory parole proceedings, and specifically, both the February 17, 2005, and June 14, 2005, reopening of Bowers' case.

12

B.      *Bowers' prison record and prior parole hearings*

Bowers' prison record is relevant to the Parole Commission's mandatory parole determination of whether "he has seriously or frequently violated institution rules and regulations or that there is a reasonable probability that he will commit any Federal, State, or local crime." 18 U.S.C. § 4206(d). In its October 6, 2005, original jurisdiction decision denying Bowers mandatory parole, the Parole Commission discussed Bowers' escape attempt and a letter Bowers sent to the victim's wife. We thus briefly describe these events as well as Bowers' initial mandatory parole hearing in which Bowers was granted mandatory parole.

While serving his 1974 murder sentence, Bowers unsuccessfully attempted to escape from prison on August 1, 1979. In the early evening, while other inmates were in the recreation yard, Bowers and another inmate scaled an interior perimeter fence and were subsequently pinned down by tower gunfire between the inner and outer fences. The other inmate was hit twice by the gunfire and Bowers stopped his attempt to escape. The 1979 attempted escape created a "very serious situation" because a number of inmates were in the yard at the time. The investigator recommended that Bowers "be transferred to another . . . institution, [and] that any and all administrative sanctions be taken due to the seriousness of the situation." Bowers was convicted and sentenced to a 6-month consecutive

13

prison term for attempted escape by the United States District Court for the Central District of California.

Bowers also sent a letter to Ranger Patrick's widow, Tomie Patrick Lee, in 1990. During one of Bowers' requests for discretionary parole, Lee informed the Parole Commission about the letter. Bowers admitted sending a letter to Lee, but explained that he did so because he received a certified receipt form indicating that a letter had been sent from the penitentiary to Lee in his name. According to a summary written by Hearing Examiner Samuel Robinson following a November 29, 1995, hearing, "the return receipt was actually a victim-witness notification sent out by the Bureau of Prisons and erroneously given to [Bowers] at mail call." Robinson reviewed the letter and "found that it appeared to be the type of letter that [Bowers] represented it to be in that it was an explanation of the circumstances regarding his receipt of a notice that a letter had been sent to her under his name." Robinson "did not find this letter to be threatening or intimidating in any manner" and "would not find that th[e] letter would be . . . any basis for the denial of parole." Robinson did not recommend discretionary parole, however, and Bowers remained incarcerated.

Although Bowers was not granted discretionary parole, he was scheduled for release on mandatory parole on April 7, 2004. On that day, however, Bowers

was informed that he was precluded from parole based on his waiver of a 2002 Statutory Interim Hearing.   Bowers filed an emergency petition for writ of habeas corpus in the United States District Court for the Middle District of Florida.[8]  In an order dated October 26, 2004, the district court rejected the Parole Commission's waiver argument, granted Bowers' petition, and ordered the Parole Commission to "immediately review Petitioner's file to determine whether or not a mandatory parole consideration hearing is necessary," and, if so, to hold the hearing within 60 days.  Order Granting Petition at 7, *Bowers v. Holder*, No. 5:04-cv-208-Oc-10GRJ (M.D. Fla. Oct. 26, 2004).

A mandatory parole hearing was held on December 21, 2004.  Hearing Examiner Rob Haworth found Bowers was not likely to commit a future crime and noted, for the previous 15 years, Bowers "has been an outstanding inmate and an asset to the operation of the prison."  After conducting the hearing and a "thorough review" of the case, Haworth found  Bowers to be "an excellent candidate for mandatory parole."  Haworth recommended Bowers be granted mandatory parole effective February 21, 2005.  A second Hearing Examiner concurred with Haworth's recommendation on January 6, 2005, and Commissioner Mitchell, acting in his Regional Commissioner capacity, approved the panel's

---

[8]  Bowers' 2004 emergency petition for writ of habeas corpus is not before us.

recommendation on January 13, 2005. The Attorney General did not request review of the Regional Commissioner's decision by the National Appeals Board pursuant to § 4215(c) of the Parole Act. *See also* 28 C.F.R. § 2.26(f).

C.     *The Parole Commission's February 17, 2005, reopening of Bowers' case*

On February 16, 2005, a few days before Bowers' scheduled release, Parole Commission staff member Stephen Husk advised the Parole Commission's General Counsel and Chief of Staff that a victim had not been notified of Bowers' mandatory parole hearing. The next day, the Parole Commission received a letter from Ranger Patrick's widow reporting that she had not been notified of the hearing and requesting that she be allowed to provide information to the Parole Commission.

That same day, Commissioners Spagnoli and Cushwa voted to reopen the case, delay Bowers' release, and schedule a "special reconsideration hearing" pursuant to 28 C.F.R. § 2.28(f). The Parole Commission issued a Notice of Action on February 17, 2005, reopening the case pursuant to 28 C.F.R. § 2.28(f) "to consider new adverse information" and stating that the Parole Commission "has received information from the registered victim(s) in your case that may impact the Commission's decision to parole you."

On March 18, 2005, Douglas Thiessen, the Parole Commission's Assistant General Counsel, prepared a memorandum noting that Ranger Patrick's widow had sent the Parole Commission a letter regarding a 2002 radio interview given by Bowers. Thiessen "listened to the interview several times" and summarized its contents. In the interview, Bowers maintained his innocence and stated his belief that the FBI targeted him because of his political activity. Bowers also "identifie[d] himself with other prisoners who have labeled themselves 'political prisoners.'"

That same day, the Parole Commission provided Bowers a Supplemental Notice of Action advising him that it had received "two letters from the wife of the victim and one letter from a confidential source." The March 18, 2005, notice specified that the victim's wife's March 12, 2005, letter described an "attempt to contact her via the mail and [Bowers'] repeated denial of guilt and multiple claims (both at sentencing and recently) to be a political prisoner." The notice also specified that the confidential source's March 14, 2005, letter asserted that the 1979 escape attempt and 1990 letter to Mrs. Lee constituted "serious institutional misconduct under 18 U.S.C. § 4206(d)." The Parole Commission noted it would consider the new information, as well as the information already in the Parole Commission's possession, at the special reconsideration hearing. Specifically, the

17

Parole Commission stated it would determine (1) "whether your political views were the impetus for your crime, and whether you continue to be motivated by the underlying reason for your crime (your reported desire to kill a law enforcement officer), if you were to be released from prison," (2) "whether you pose a particular risk to the victim's family," and (3) "whether your 1979 escape attempt and 1990 letter writing to the victim constitute serious institutional misconduct under 18 U.S.C. § 4206(d).

On March 21, 2005, Hearing Examiner Paul Howard conducted the "special reconsideration hearing." Howard found that the issues raised in the Notices of Action and the letters were "not new and significant information" because "the Commission has addressed them and they are not relevant to the subject's current mindset and behavior." Howard stated Bowers "has been a model prisoner since 1979 and there is simply no basis to deny mandatory parole at this time." Howard recommended Bowers be granted mandatory parole effective May 7, 2005. Howard also recommended designating the case for the original jurisdiction of the Parole Commission "[b]ased on the significant public interest in this case, the nature of the offense, and that it being a life sentence."

Hearing Examiner  K. Pinner concurred with the grant of mandatory parole and the original jurisdiction designation, but recommended that the parole date be

set at June 21, 2005.  A second Hearing Examiner, S. Husk, agreed with Hearing Examiner Pinner.  Both Husk and Pinner agreed that Bowers did not pose a risk upon release based on his political beliefs.  Husk also "weighed the seriousness of the past infraction(s) against the entire institutional record and conclude[d] that the seriousness of the escape attempt [did] not overrule [Bowers'] suitability for mandatory parole at the current time."  Thus, the recommendation of the Hearing Panel was to grant Bowers' mandatory parole effective June 21, 2005, and set the case for the original jurisdiction of the Parole Commission.

D.    *The Parole Commission's May 2005 original jurisdiction decision*

On April 19, 2005, Commissioner Spagnoli voted to designate the case for the Parole Commission's original jurisdiction.  Per agency practice, each Commissioner voted on the case without holding an additional hearing.  *See* 28 C.F.R. § 2.17(a).  Commissioner Spagnoli wrote a four page memorandum disagreeing with the Hearing Panel recommendation to grant Bowers' mandatory parole effective June 21, 2005, and instead voted to deny mandatory parole because there was a "reasonable probability that [Bowers would] commit a federal, state or local crime and that you seriously violated institution rules and regulations."  Commissioner Cushwa agreed with Commissioner Spagnoli on April 20, 2005.  That same day, the Parole Commission informed Bowers that his

case had been "designated as Original Jurisdiction and referred to the National Commissioners for decision."

On May 6, 2005, Commissioner Mitchell, the Regional Commissioner on the case, signed off on the order prepared by the Hearing Panel granting Bowers mandatory parole effective June 21, 2005. Three days later, Chairman Reilly also signed the order. On May 12, 2005, Commissioner Fulwood recused himself from voting on Bowers' case because he previously "served for 29 years in law enforcement and during that period there were a number of police officers killed in the performance of duty and in this case a police[man] was murdered." The remaining four Parole Commissioners were thus evenly spit in the original jurisdiction decision.

Due to the 2-2 split vote, Chairman Reilly sought the advice of the Parole Commission's legal counsel, Rockne Chickinell. In a memorandum dated May 13, 2005, Chickinell stated "because the Commission has not found by a majority vote of the Commission that one of the permissible reasons for denying mandatory parole exists, the Commission must grant Bowers mandatory parole in order to comply with 18 U.S.C. § 4206(d)."[9] That same day, Regional Commissioner

---

[9] In 2010, the Parole Commission revised its regulations to explain that a tie vote in this situation results in the grant of mandatory parole. 28 C.F.R. § 2.63(b)(1),(2) (2011).

Mitchell and Chairman Reilly signed another order granting Bowers mandatory parole. By Notice of Action dated May 17, 2005, the Parole Commission informed Bowers of its decision to grant him mandatory parole effective June 21, 2005. The Notice stated "the Commission has not made a finding that one of the permissible reasons for denying mandatory parole exists in your case." The Notice also stated the decision was "appealable to the Commission under 28 C.F.R. [§] 2.27."

E.    *The Attorney General's appeal and the Parole Commission's June 14, 2005, reopening of Bowers' case*

At the end of May 2005, the Office of the Deputy Attorney General requested information about Bowers' case from the Parole Commission's Chief of Staff. In a memorandum dated May 31, 2005, the Parole Commission's Chief of Staff described the administrative appeal process as well as the background on the Bowers case. The memorandum noted both an inmate and an attorney general may appeal a Parole Commission decision under 18 U.S.C. § 4215, and stated in a footnote "the view of the Commission's legal office that § 4215(c) would also apply to original jurisdiction cases, even though the Commission's regulations do not specifically refer to Attorney General appeal of such cases." Counsel to the Deputy Attorney General posed some followup questions, including whether it

21

would be "appropriate for Commissioner Cushwa to explain in her own words why she voted to detain." The Parole Commission's Chief of Staff responded in a June 1, 2005, memorandum:

> [I]t would be inappropriate and not in the best interests of the Commission—or the Attorney General—for the Attorney General to ask her to explain her vote. For one thing, it suggests a relationship incompatible with the independence sought by Congress when it established the Commission and could create the appearance of an attempt to influence.

> On June 9, 2005, then-Attorney General Alberto Gonzales requested that,

"[p]ursuant to the Rules and Procedures of the United States Parole Commission and in response to the May 17, 2005 Notice of Action," the Parole Commission "review and consider the Veronza L. Bowers matter and render a new decision on whether to grant or deny parole to Bowers." The memorandum further stated that:

> Because the original jurisdiction decision was split 2-2-1, reconsideration may clarify the Parole Commission's decision in this matter. Further, review will give each of the five Commissioners the opportunity to clarify their positions on whether to grant or deny parole to Bowers. Finally, the review may address any factual and/or legal ambiguities contained in the initial decision.

On June 14, 2005, the Parole Commissioners, with the exception of Commissioner Fulwood, voted to reopen the case and delay Bowers' mandatory parole date of

22

June 21, 2005, "for up to 60 days to consider petition of the Attorney General for reconsideration of Original Jurisdiction decision."

F.      *The Parole Commission's October 6, 2005, reconsideration of its May 2005 original jurisdiction decision*

In the Parole Commission's 30-year history, no Attorney General had ever sought review of an original jurisdiction decision. Based on the "unprecedented review," it was necessary for the Parole Commission to develop procedures to handle the Attorney General's request. The Parole Commission scheduled two meetings for July 28, 2005, to develop these procedures. The first meeting was to be open to the public to discuss "[r]ule amendments for reviewing future requests from the Attorney General for reconsideration of a Commission decision." The second meeting was to be "closed" to discuss the "[p]rocedure to be followed for review of one original jurisdiction case upon request of the Attorney General as provided in 18 U.S.C. Sec. 4215(c)."[10] On July 18, 2005, Bowers' counsel faxed his objections to the Parole Commission's review of the original jurisdiction decision, as well as the Parole Commission's failure to give Bowers an opportunity to participate in the "closed" meeting. The Parole Commission

_____

[10] On July 21, 2005, the Parole Commission's General Counsel certified that consideration of the procedures in Bowers' case could be closed to the public under the Government in the Sunshine Act, 5 U.S.C. § 552b. Consideration of the potential rule change, however, was a matter for an open business meeting.

23

provided the Department of Justice a draft set of rules and procedures for deciding the Attorney General's petition, and on July 27, 2005, the Department of Justice provided comments as to how its appeal should be handled. At the July 28, 2005, meeting, the Parole Commission postponed consideration of the procedures to be used in Bowers' case.

The Parole Commission reconvened on August 2, 2005, at a second "closed" meeting and voted on the procedures for Bowers' case. According to an August 8, 2005, internal memorandum from Commissioner Spagnoli, the Parole Commission "had not noticed the meeting as required by law." In a letter dated August 9, 2005, the Parole Commission sent Bowers and his attorney letters notifying them that "[t]he Parole Commission has adopted procedures for consideration of the Attorney General's request for review in your case," and it has enclosed a copy of the procedures. The Parole Commission noted it would consider the Attorney General's request at its next regularly scheduled meeting on October 5, 2005. Under the procedures adopted by the Parole Commission, the Attorney General, Ranger Patrick's widow, and any other interested party had 20 days to submit written comments. Bowers then had 20 days to file his response.

The Office of the Deputy Attorney General filed comments on September 1, 2005. On September 21, 2005, Bowers filed a timely response. The Department

of Justice filed another set of comments on September, 30, 2005, and requested an opportunity to appear before the Parole Commission during its closed meeting.[11] On October 3, 2005, Bowers' counsel objected to the September 30, 2005, filing as unauthorized by the Parole Commission's newly-adopted procedures. Bowers' counsel also filed a substantive response to the September 30, 2005, comments.

On October 6, 2005, the Parole Commission considered Bowers' case in a "closed" meeting.[12] Commissioner Fulwood recused himself. At the meeting, Assistant General Counsel Thiessen orally presented the case, stating he was "the person who would know the facts of this case better than anybody because I defended it several times in federal court and have been working closely with the Attorney General's Office back and forth regarding this review."[13] Thiessen then summarized the underlying crime, the 1979 escape attempt, Bowers' political views, and the fears expressed by Ranger Patrick's widow. Thiessen recommended denying mandatory parole. Ultimately, all four Commissioners agreed that the escape attempt was "serious institutional misconduct," while

---

[11] This request was denied.

[12] The meeting was closed to the public under the Government in the Sunshine Act, 5 U.S.C. § 552b.

[13] On September 23, 2005, Thiessen had prepared an appeal summary for the Parole Commission, recommending denial of mandatory parole.

Chairman Reilly, Commissioners Cushwa and Spagnoli also all found that Bowers was likely to commit a crime in the future. Commissioners Cushwa and Spagnoli further found Bowers' 1990 letter to Ranger Patrick's widow to be a "serious" violation of institutional rules.

On October 7, 2005, the Parole Commission issued a Notice of Action on Appeal informing Bowers of the parole denial. The notice stated Bowers had "seriously violated the rules of the institution and that there is a reasonable probability that [Bowers] will commit a Federal, State, or local crime." With respect to the finding that Bowers was likely to commit another crime, the Parole Commission explained that the "killing of Ranger Patrick was motivated by your attitude towards and hatred for the United States Government," and it found that Bowers "continue[d] to harbor the same beliefs and attitudes that led [him] to" murder Ranger Patrick. The Parole Commission relied on the 2002 radio interview, in which Bowers "reiterated [his] hatred for the United States Government" and his continued claims of being held as a "political prisoner." Finally, the Parole Commission relied on the 1990 letter, which "further indicates that you are likely to commit a crime."

G.    *Bowers' interim parole hearings and the discovery of Commissioner Spagnoli's June 1, 2005, memorandum*

Bowers submitted another parole application on May 7, 2007, for a Statutory Interim Hearing. 18 U.S.C. § 4208(h)(2). The Parole Commission scheduled Bowers for a hearing on August 3, 2007. This hearing was cancelled by the Parole Commission at the last minute, over Bowers' counsel's objection, based on a request from an Associate Deputy Attorney General, who had not received adequate notice of the hearing. In a letter dated August 8, 2007, Bowers' counsel stated "the Commission's willingness to accede to [the Department of Justice's] demands reflects a lack of the independence Congress contemplated when it established the Commission." The Parole Commission rescheduled the hearing for September 27, 2007.

On September 7, 2007, Chairman Reilly informed Bowers that Commissioner Spagnoli "had prepared a memorandum dated June 1, 2005 addressed to the Deputy Attorney General, in which the Commissioner outlined arguments that could be used by the Attorney General to file an appeal of a decision that had granted you parole." In his letter, Chairman Reilly provided Bowers with a redacted copy of Commissioner Spagnoli's June 1, 2005, memorandum, which had been sent without the other Parole Commissioners' knowledge, and informed Bowers that the Parole Commissioners agreed Commissioner Spagnoli's memorandum "creates an appearance that former

27

Commissioner Spagnoli may not have exercised impartial judgment in voting on the Attorney General's appeal." The Chairman also stated that Commissioner Spagnoli's memorandum played no role in his or the other Parole Commissioners' decision-making, and "that our votes were based on our independent assessments of the merits of your case." Finally, Chairman Reilly stated that Bowers' upcoming hearing would be held as a *de novo* proceeding, and that "[a]ny findings that were made in the October 7, 2005 decision will not be determinative of the outcome following your new hearing."

Bowers' counsel requested postponement of the interim hearing set for September 27, 2007, after receiving a copy of Commissioner Spagnoli's June 1, 2005, memorandum. Based on this "startling revelation," counsel believed he might find other documents bearing on the Parole Commission's actions in 2005 and requested more time to do so. Bowers again applied for parole by a form dated April 14, 2008. He was scheduled for the December 2008 docket in Atlanta, but Bowers' counsel again requested that the parole hearing be removed from the docket without prejudice to Bowers reapplying for a hearing.

### III.  PROCEDURAL BACKGROUND

On June 24, 2008, Bowers filed his petition for a writ of habeas corpus in the Northern District of Georgia, challenging the October 6, 2005, decision of the

28

Parole Commission to deny him release on mandatory parole pursuant to 18 U.S.C. § 4206(d). Specifically, the petition challenges the February 17, 2005, decision to reopen Bowers' case pursuant to 28 C.F.R. § 2.28(f), and the June 14, 2005, decision to reopen Bowers' case pursuant to 28 C.F.R. § 2.27. The petition claims the Parole Commission violated Bowers' due process rights, the Parole Act, and the Parole Commission's rules and regulations, "by twice reopening Mr. Bowers' case, failing to release him on parole as twice scheduled, failing to act as a neutral, unbiased decision-maker, making arbitrary and result-oriented decisions, and then denying him release on mandatory parole."

In his memorandum of law supporting the petition, Bowers challenges as unlawful both the Parole Commission's reopening of his case on February 17, 2005, and its consideration of the Attorney General's request for review on June 14, 2005. Bowers also contends the Parole Commission's October 6, 2005, decision was tainted by political pressure and the actions of Commissioner Spagnoli. As relief, the petition claims the court should reinstate the Parole Commission's May 17, 2005, decision granting Bowers parole and order Bowers released on mandatory parole to restore him to his status before the Parole Commission unlawfully rescinded his parole. He claims this is the only adequate remedy in light of the Parole Commission's actions.

29

In its response, the Parole Commission concedes that Commissioner Spagnoli's June 1, 2005, memorandum gave "an appearance that she may not have been an impartial decision-maker in considering the [Attorney General's] petition for review." However, the Parole Commission opposes Bowers' contention that the remaining Parole Commissioners acted unlawfully. With regard to the February 17, 2005, decision to reopen, the Parole Commission argues the decision was authorized by its regulations because it was based on the receipt of "new and significant adverse information." With regard to the June 14, 2005, decision to reopen, the Parole Commission focuses on the Attorney General's authority to petition for review of the original jurisdiction decision. Although the Parole Commission concedes that a biased Parole Commissioner "would so undermine the integrity of the decision-making process [such] that the decision must be vacated," it argues Bowers' requested remedy of immediate release was improper. Rather, the Parole Commission claims the appropriate remedy would be an order to correct any error within a selected time period.

Bowers' petition was referred to a magistrate judge who entered a Report and Recommendation recommending that his petition be granted. The magistrate judge did not analyze either the February 17, 2005, reopening or the June 14, 2005, reopening. Rather, the magistrate judge's recommendation was based on

30

two conclusions: (1) the Attorney General's June 9, 2005, appeal was unauthorized, and (2) the Parole Commission's October 6, 2005, decision was tainted by the June 1, 2005, memorandum of Commissioner Spagnoli and the undue influence of the Attorney General, and was not rationally based. The magistrate judge also concluded the appropriate remedy was to vacate the October 2005 order and reinstate the May 2005 decision granting Bowers mandatory parole. The magistrate judge did not believe Bowers "could obtain a hearing by impartial decision-makers if the Court were to order a new hearing before the Commission as presently composed"[14] because she was persuaded "that the impartiality of the Commission as a whole was affected by the actions of Commissioner Spagnoli, the Attorney General and others, and that the taint on the Commission's decision-making could not be eradicated simply by an order from this Court directing the Commission to grant Petitioner a new parole hearing." Final Report and Recommendation and Order at 59-60, June 4, 2009.

The district court held a hearing on December 17, 2009. The district court then entered an order, rejecting the magistrate judge's recommendation. The substantive portion of the district court's order reads:

---

[14] At the time of the magistrate judge's order, "all of the Commissioners involved in the October 6, 2005 decision, with the exception of Commissioner Spagnoli, remain[ed] on the Commission." Final Report and Recommendation and Order at 59-60, June 4, 2009.

31

The court first duly notes that Magistrate Judge Cole's well researched and reasoned Report and Recommendation is commendable. Regretfully, however, the Court is unable to adopt her recommendation. As Petitioner acknowledged at the hearing, "a parole is not effective finally until the prisoner is in fact released." Here, the prisoner was never in fact released, and the court is not persuaded that the Parole Commission, at any point, was without jurisdiction or authority to revise its decision to grant or deny Petitioner's parole. Hence, the court will not reverse the Commission's decision to deny Petitioner's parole. The court hereby DENIES the habeas petition.

Order at 1-2, March 11, 2010.

On March 15, 2010, the clerk of court entered judgment, denying and dismissing Bowers' habeas petition. Bowers filed a notice of appeal on May 7, 2010.

## IV. STANDARD OF REVIEW

We review *de novo* the district court's denial of habeas relief under 28 U.S.C. § 2241. *Byrd v. Hasty*, 142 F.3d 1395, 1396 (11th Cir. 1998). A district court's factual findings are reviewed for clear error. *Id.*

Our review of a Parole Commission proceeding is narrow and limited. Congress has provided that the Parole Commission's substantive decisions to grant, deny, modify, revoke, or impose conditions on parole "shall be considered actions committed to agency discretion for purposes of section 701(a)(2) of title 5, United States Code." 18 U.S.C. § 4218(d). Here, however, we are not reviewing

32

the substantive decision of the Parole Commission to deny Bowers' mandatory parole. Our review is limited to whether the Parole Commission acted unlawfully such that Bowers "is in custody in violation of the Constitution or laws . . . of the United States." 28 U.S.C. § 2241(c)(3). We will not reverse the decision of the Parole Commission "unless it involves flagrant, unwarranted, or unauthorized action that constitutes an abuse of the Commission's discretion." *Glumb*, 891 F.2d at 873.[15]

## V. DISCUSSION

The parties focus heavily on whether the Attorney General had the authority to seek reconsideration of the Parole Commission's original jurisdiction decision. We find these arguments misplaced. The Attorney General's June 9, 2005, memorandum requesting reconsideration of the Parole Commission's decision is not determinative. We focus instead on whether the Parole Commission engaged in "flagrant, unwarranted, or unauthorized action" by reopening Bowers' case on February 17, 2005, to consider new adverse information, and on June 14, 2005, to reconsider the Parole Commission's original jurisdiction decision. *See Glumb*, 891 F.2d at 873. As discussed below, we conclude the first reopening was lawful, but the second was not.

---

[15] This is the standard of review espoused by the Government.

A.    *The Parole Commission's February 17, 2005 reopening*

The lawfulness of the February 17, 2005, decision is dependent on whether

the Parole Commission received "new and significant adverse information"

pursuant to 28 C.F.R. § 2.28(f).   Section 2.28(f) provides:

> Upon receipt of new and significant adverse information . . . , a
> Commissioner may refer the case to the National Commissioners with
> his recommendation and vote to schedule the case for a special
> reconsideration hearing.  Such referral shall automatically retard the
> prisoner's scheduled release date until a final decision is reached in
> the case.

28 C.F.R. § 2.28(f).

On February 16, 2005, the Parole Commission received notice from Ranger

Patrick's wife, the registered victim, stating she had not been notified of Bowers'

mandatory parole hearing.  On February 17, 2005, the Parole Commission

received a letter from Ranger Patrick's wife indicating a desire to provide

additional information relevant to the § 4206(d) factors.  That same day,

Commissioners Spagnoli and Cushwa signed an order reopening Bowers' case

pursuant to § 2.28(f) for a special reconsideration hearing.[16]

---

[16]  The Parole Commission subsequently received a second letter from the registered
victim summarizing what she believed Bowers' institutional misconduct to be, as well as a letter
from a confidential source stating Bowers' claims to be a political prisoner were baseless,
summarizing Bowers' institutional misconduct, and arguing Bowers remained a danger to society
due to his lack of remorse.

Although Bowers contends the information received by the Commission was not "new and significant adverse information," that phrase has been interpreted broadly by the courts. *See Lewis v. Beeler,* 949 F.2d 325, 328 (10th Cir. 1991) (noting information is "new" if it is not received by the Commission before the release decision that is to be revisited); *Goble v. Matthews*, 814 F.2d 1104, 1108 (6th Cir. 1987) (stating information may be "new" if it was in the parole file but inadvertently overlooked at the time of the release decision). We conclude "new and significant adverse information" is broad enough to include a letter from a registered victim indicating her desire to provide information related to the § 4206(d) factors.

The registered victim's February 17, 2005, letter was "new" in that it was not received by the Commission before Bowers' December 21, 2004, mandatory parole hearing. *See Lewis*, 949 F.2d at 328. The letter was also "significant" as evidenced by the Parole Act's mandate that the Commission "*shall* consider, if available and relevant: . . . a statement . . . by any victim of the offense for which the prisoner is imprisoned . . . ." 18 U.S.C. § 4207(5) (emphasis added). The registered victim was unable to provide information pursuant to 18 U.S.C. § 4207 at Bowers' original mandatory parole hearing due to lack of notice. Further, the letter was "significant" because the information proffered by the registered victim

was relevant to the § 4206(d) factors. Because the letter constituted "new and significant adverse information" as contemplated by 28 C.F.R. § 2.28(f), we conclude the Parole Commission acted within its statutory and regulatory authority when it reopened Bowers' case on February 17, 2005, to permit consideration of the registered victim's information.

B.      *The Parole Commission's June 14, 2005, reopening*

We next consider the lawfulness of the Parole Commission's decision to reopen Bowers' case on June 14, 2005, to reconsider the Parole Commission's May 2005 evenly-split original jurisdiction decision that resulted in the grant of mandatory parole. We focus on the actions of Commissioner Spagnoli surrounding the decision to reconsider Bowers' case, and conclude she violated the Parole Act's mandate that the Parole Commission function as an independent agency, impermissibly tainting the Parole Commission's decision to reopen.

Congress established the Parole Commission "as an independent agency in the Department of Justice." 18 U.S.C. § 4202. The legislative history indicates Congress intended "that parole decisionmaking be independent of, and not governed by, the investigative and prosecutorial functions of the Department of Justice." S. Rep. No. 94-648, at 21 (1976) (Conf. Rep.). The Parole Commission's "decision-making machinery is independent so as to guard against

36

influence in case decisions." S. Rep. No. 94-369, at 20 (1975); *see also Dye v. United States Parole Comm'n*, 558 F.2d 1376, 1378 (10th Cir. 1977) (noting the emphasis in the Parole Act "is on increasing procedural safeguards in reducing arbitrary decision-making").

The Parole Act also "preserves the independence and integrity of the U.S. Parole Commission by providing the Attorney General (and through the Attorney General, the prosecutorial arm of the Department of Justice) with a formal procedure for making objection to any parole release or denial ordered by a Commissioner." Paroling, Recommitting, and Supervising Federal Prisoners: Procedures for Attorney General Requests to Review Parole Decisions, 59 Fed. Reg. 40257–08 (Aug. 8, 1994). The Parole Commission explicitly recognized the application of this independence principle to Bowers' case, noting it would not be in the Commission's best interests to explain itself to the Attorney General because it would "suggest[] a relationship incompatible with the independence sought by Congress when it established the Commission and could create the appearance of an attempt to influence."

Here, the actions of Commissioner Spagnoli demonstrate she was not acting as an independent and neutral decision-maker at the time of the Parole Commission's June 14, 2005, decision to reconsider its evenly-split original

jurisdiction decision. Commissioner Spagnoli prepared a 14-page "Memorandum for the Deputy Attorney General" on June 1, 2005, without the knowledge or consent of the other Parole Commissioners. Spagnoli Memorandum, R10, Exh. 71. The Parole Commission does not dispute that the memorandum was in fact sent to and received by a Deputy Attorney General within the Department of Justice. Although Commissioner Spagnoli's memorandum was entitled "Memorandum for the Deputy Attorney General," it did not list a specific recipient. The specific recipient is not relevant to the bias of Commissioner Spagnoli; the existence of the memorandum, which the Parole Commission does not dispute was sent to and found in the files of the Department of Justice, is sufficient to establish Commissioner Spagnoli's bias against Bowers.

The Parole Commission did not become aware of Commissioner Spagnoli's memorandum until September of 2007, after the Office of Information and Privacy of the Department of Justice referred the memorandum following a Freedom of Information Act request from another party. The subject of Commissioner Spagnoli's memorandum was "Issues relating to whether or not the Attorney General should appeal the Parole Commission's [d]ecision to grant mandatory parole to Veronza Bowers." Spagnoli Memorandum, R10, Exh. 71 at 1. The Parole Commission concedes this memorandum, which it does not dispute was

found in the files of the Department of Justice, "creates the appearance that [Commissioner Spagnoli] may have not exercised impartial judgment in voting on the Attorney General's request to review the parole decision for Bowers." We agree.

As the magistrate judge noted, Commissioner Spagnoli's memorandum can "be characterized as a polemic against the decision to parole." The memorandum described Bowers in negative terms and omitted all favorable information. For instance, in the memorandum, Commissioner Spagnoli cited selective portions of a December 2004 forensic evaluation of Bowers that she interpreted as "highly relevant to a determination that [Bowers] has a reasonable possibility of committing future crimes." Spagnoli Memorandum, R10, Exh. 71 at 7. The memorandum failed to include the forensic evaluation's positive conclusion that "should [Bowers] be granted parole, [he] would in all likelihood continue to engage in a lifestyle that is respectful of himself and others." R1, Exh. 27 at 10. In addition, the memorandum included a criminal charge of aiding and abetting an assault that the Ninth Circuit Court of Appeals had considered and instructed the "[Parole] Commission to disregard . . . because [Bowers'] due process rights were violated—not because he didn't commit the act." Spagnoli Memorandum, R10, Exh. 71 at 9. Commissioner Spagnoli's memorandum provided this information

39

so that the Attorney General could "make sure that we make specific findings as to each and every angle that exists statutorily and legally to potentially keep this defendant in prison." *Id.*

In preparing this "Memorandum for the Deputy Attorney General" presenting "potential appeal issues," Commissioner Spagnoli departed from her statutory role of a neutral decision-maker as a Parole Commissioner and took on an advocate's role of seeking a particular outcome. *See Dye*, 558 F.2d at 1378 ("The Commission does not function as an adversary to the prisoner."). Moreover, she attempted to enlist the aid of the Department of Justice, by way of the Attorney General, to achieve her desired outcome.[17] Commissioner Spagnoli's "secret memorandum" violated the Parole Act's mandate that the Parole Commission function "as an independent agency in the Department of Justice." 18 U.S.C. § 4202; *see also Brennan v. Occupational Safety and Health Review Comm'n*, 502 F.2d 30, 32 (5th Cir. 1974) (noting an agency "is no more than a creature of

---

[17] Although the memorandum purported not to "reach a conclusion with regard to whether the Attorney General should appeal the case," the memorandum presented a request for reconsideration as a win-win situation for the Attorney General—if the Parole Commission were to affirm its decision after review, "the Attorney General did everything he could to prevent [Bowers' release] from happening," and if the Parole Commission reverses its decision, "the Attorney General gets credit for protecting the public from a dangerous criminal."

Congress and, as such, may proceed only in conformity with its congressional grant of authority").[18]

Commissioner Spagnoli's inappropriate actions were not limited to the June 1, 2005, memorandum. She also initiated communications regarding the Bowers case with several other Department of Justice officials. For instance, on May 24, 2005, she contacted an Office of Intergovernmental and Public Liaison official, offering to walk her through the Bowers case. Commissioner Spagnoli also contacted several other Department of Justice officials, including those within the Office of Legal Counsel and the Office for Victims of Crime. After the Attorney General's petition for reconsideration of the original jurisdiction decision was granted, Commissioner Spagnoli contacted Edward McNally, the Department of Justice's "point person" on the Bowers appeal, stating:

> I need to talk to you ASAP about the appeal issue, I stopped by your office this am but your door was locked. I have talked to Kyle, Steve B. and Wendell Taylor . . . Please call me as soon as you get a chance.

This e-mail prompted a series of communications with Mr. McNally, which included Commissioner Spagnoli sharing both a proposed rule and internal Commission e-mails. These communications culminated in an e-mail sent from

---

[18] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

Commissioner Spagnoli to Mr. McNally on October 6, 2005, the date the Parole Commission agreed to deny Bowers' mandatory parole. The e-mail was succinct: "Victory."

Commissioner Spagnoli's clandestine communications with the Department of Justice also violated the Parole Act's mandate that the Parole Commission function "as an independent agency in the Department of Justice." 18 U.S.C. § 4202; *see Brennan*, 502 F.3d at 32. Commissioner Spagnoli again inappropriately assumed the role of advocate against Bowers and functioned "as an adversary to the prisoner." *Dye*, 558 F.2d at 1378.

Before the district court, the Parole Commission conceded that in this case, a finding that Commissioner Spagnoli was biased "would so undermine the integrity of the decision-making process that the decision must be vacated." Under the particular facts of this case, we agree that the decision of the Parole Commission to reopen Bowers' case was impermissibly tainted by Commissioner Spagnoli's "unauthorized action[s]" revealing her bias. *Glumb*, 891 F.2d at 873. We thus vacate the Parole Commission's June 14, 2005, order reopening Bowers' case.

By vacating the June 14, 2005, order, we necessarily vacate the Parole Commission's October 6, 2005, original jurisdiction decision denying Bowers

42

mandatory parole.[19]  Bowers contends the appropriate remedy is to order him immediately released on mandatory parole.  This we will not do.  *See, e.g., Jones v. United States Bureau of Prisons*, 903 F.2d 1178, 1181 (8th Cir. 1990) ("[N]either the district court nor this court has the right to correct the mistake by ordering the prisoner released.") (citation omitted); *Luther v. Molina*, 627 F.2d 71, 76 (7th Cir. 1980) ("[Parole] [r]elease, whether outright or on bail, would rarely be necessary or appropriate.").  Rather, we direct the district court to return this case to the Parole Commission in its posture as of May 17, 2005, the date of the last Parole Commission action taken before Commissioner Spagnoli's unlawful actions.

As of May 17, 2005, the Parole Commission's evenly-split original jurisdiction decision was operative.  In this posture, Bowers is entitled to mandatory parole based on the May 2005 original jurisdiction decision unless the Parole Commission takes further action pursuant to its rules and regulations.[20]  Upon return, the Parole Commission shall immediately review Bowers' file to determine *ab initio* whether any further action is necessary or authorized.

---

[19]  We express no opinion on the substantive merits of the Parole Commission's October 6, 2005, decision.

[20]  We agree with the district court that the Parole Commission retains jurisdiction over Bowers, at a minimum, until he is in fact released.  *See* 18 U.S.C. § 4210 (describing the jurisdiction of the Parole Commission).

We express no opinion on the merits of either of the Parole Commission's May 2005 or October 2005 original jurisdiction decisions. Indeed, we are not deciding that the Parole Commission is barred from reconsidering its May 2005 original jurisdiction decision.[21] It is up to the Parole Commission, not this Court, to decide what, if any, further action is warranted in Bowers' case. All we hold is that, if the Parole Commission decides to take further action, it must proceed in the manner authorized by the Parole Act and the Parole Commission's rules and regulations. Finally, contrary to Bowers' claim, we believe Bowers will receive a fair and impartial hearing if any further action is, in fact, taken by the Parole Commission. Commissioner Spagnoli resigned in 2007, and there is no evidence any of the current Parole Commissioners would act outside the confines of the Parole Act or the Parole Commission's rules and regulations.

## VI. CONCLUSION

For the foregoing reasons, we REVERSE the district court's denial of habeas relief on Bowers' claim that the Parole Commission violated the Parole Act by reopening his case on June 14, 2005, and REMAND to the district court with instructions to remand this case to the Parole Commission in its posture as of

---

[21] The Parole Commission recently revised its rules to permit the Parole Commission to "re-vote on a case disposition to resolve a tie vote or other impasse in satisfying a voting requirement of these rules." 28 C.F.R. § 2.63(b)(3) (2011).

44

May 17, 2005. The Parole Commission shall immediately review Bowers' case to determine whether any further action is necessary or authorized. Unless the Parole Commission initiates proceedings within sixty (60) days, the district court shall grant Bowers' petition for writ of habeas corpus and direct the Parole Commission to begin release planning and implement the mandatory parole authorized and required by 18 U.S.C. § 4206(d). We AFFIRM the district court's denial of habeas relief as to Bowers' remaining claims.

**REVERSED and REMANDED.**